## WILLIAMS et al. v. UNITED STATES.
### No. 46665.

Court of Claims.
May 3, 1948.

Walter Douglas, of Savannah, Ga., for plaintiff.

Kandall M. Barnes, of New York City, and H. G. Morison, Acting Asst. Atty. Gen., for defendant.

Before JONES, Chief Justice, and LITTLETON, WHITAKER, MADDEN, and HOWELL, Judges.

JONES, Chief Justice.

This case involves the value of used cars and parts of cars requisitioned by the Government in 1942.

Plaintiffs, under the firm name of Ogeechee Auto Wrecking Company, operated near Savannah, Georgia, what is commonly called an automobile graveyard. The business consisted of buying used, wrecked, and burned automobiles and trucks, removing the salable parts and marketing them.

On August 7, 1942, plaintiffs had on hand 1,257 units that had been accumulated over a twelve-year period. Many of the parts had been removed and sold, and other parts had been placed in large sheds maintained on the premises. When all the salable parts had been removed the cars were sold from time to time as scrap.

In the early part of 1942 there was a serious shortage of iron and steel. To meet the needs for military and naval equipment the War Production Board instituted programs for collecting scrap material and asked all auto wreckers to cooperate.

In June 1942 a special drive for scrap rubber was announced and in compliance with this program most of the tires were removed from the crippled cars.

On August 7, 1942, the Metals Reserve Company, acting for the War Production Board, requisitioned and took possession of the 1,257 automobile units located on plaintiffs' premises. The order described the property as follows:

"All scrap metals, including cars partially dismantled or held for scrapping or dismantling, and parts thereof, located in Ogeechee Auto Wrecking Company, R. F. D. No. 4, Ogeechee Road, Savannah, Georgia."

Plaintiffs protested the classification and plaintiffs' counsel made a trip to Washington in an effort to convince the Inventory and Requisitioned Branch of the War Production Board that the automobiles were not junk but contained valuable usable parts. Counsel testified that a representative of the Board told him flatly that the Board had levied on these automobiles and trucks as junk, and that they would be considered as junk and that plaintiffs would be paid only junk prices for them.

Ultimately, however, the requisition did not include parts which had been removed from the cars prior to the date of the requisition. Some of these parts were in storage bins, others lying loose in the cars or on the ground.

On February 17, 1943, the War Production Board advised plaintiffs of the total of the requisitioned materials as follows:

| | Pounds |
|---|---|
| Body and fender scrap | 653,195 |
| Miscellaneous scrap | 758,570 |
| Motor blocks | 236,990 |
| Radiators | 5,240 |
| Aluminum | 1,235 |

On March 4, 1943, plaintiffs filed a proof of claim with the War Production Board in the amount of $70,590, which was set out as fair and just compensation. On August 13, 1943, the War Production Board made a preliminary determination of compensation for such requisitioned property, computing the value at $6,791.07, as follows:

| Description | Price | Total |
|---|---|---|
| Body and fender scrap | $5.00 net ton | $1,622.99 |
| Miscellaneous steel scrap | $9.25 net ton | 3,508.39 |
| Motor blocks | $14.25 net ton | 1,688.55 |
| Radiators | $0.06 pound | 314.40 |
| Aluminum | $0.08 pound | 98.80 |
| | | 7,243.13 |
| Less adjustment in favor of J. T. Knight & Sons, Inc. | | 452.06 |
| | | 6,791.07 |

This allowance was based on the prevailing market price at Savannah for scrap, which usually required the purchaser to bear the expense of dismantling the automobiles, preparing the scrap and loading it into freight cars for shipment.

The War Production Board made an award of compensation based on the prevailing price of scrap, and the Metals Reserve Company, acting for the Board, offered to pay the amount of such award to plaintiffs. This offer was refused by plaintiffs. The Metals Reserve Company then offered to pay 50 percent of such award to plaintiffs, as provided by the Act of October 16, 1941, 55 Stat. 742, but that offer was not accepted. Nothing, therefore, has been paid to plaintiffs.

Two witnesses who had no financial interest in plaintiffs' property testified as to the values. A local garage man had been visiting plaintiffs' yard about twice a month to buy parts and would occasionally go among the wrecked automotive equipment. In his opinion the major portion of the requisitioned material would have sold within a period of four or five years. He estimated the value at $75,000, including the detached parts in the cars and those lying on the ground. A local scrap dealer frequently visited plaintiffs' place endeavoring to buy some or all of the cars in plaintiffs' yard for scrap. He testified that attached to these cars were valuable used parts and that used parts were worth four or five times the scrap value.

Joseph H. Miller, who had had many years' experience in the automobile wrecking business and who was a trained mechanic, was technical adviser to the Auto Graveyard Section of the War Production Board in Washington. He spent eight days in surveying plaintiffs' yard prior to the requisitioning. Mr. Miller testified that the units were pretty well stripped of usable parts before the requisitioning, and that the value of the property taken was its scrap value.

The plaintiffs and the defendant are far apart in the values placed upon the property taken. In fact, both sides were unyielding.

The plaintiffs insisted that the value of the usuable and salable parts on the 1,257 automobiles was $70,590. There they stood. Their counsel stated that it was just like cutting up a good suit of clothes to turn all these cars into scrap.

Defendant's adviser, Joseph Miller, was just as adamant. Even when shown the picture of a car taken at the time of his appraisal with himself standing by it and with many parts still on it, but with the door off the car and lying in front of it, he insisted on maintaining his position in the following language:

"It [the door] isn't on the automobile and that is a stripped automobile, so far as I am concerned. Would you buy an automobile with a door lying out in front of it?"

Somewhere between these two extremes the court must find a reasonable basis of valuation which neither party showed much disposition to even talk about, much less look for.

The $70,590 figure is much too high. An automobile graveyard is not a thing of

beauty even if the broken cars are arranged in rows. We have never seen them that way. In this instance they were scattered all over the premises. Counsel's comparison to a good suit of clothes is hardly an apt illustration.

On the other hand to treat as scrap 1,257 automobiles even though highly used and partially dismantled when they represented a substantial portion of the business that had been operated continuously for twelve years is not a reasonable basis for just compensation. Schaffer v. United States, 60 F. Supp. 760, 104 Ct.Cl. 229.

We have no doubt that the property requisitioned included some items which should not have been classified as scrap, and that the value was therefore beyond scrap prices. On the other hand, the plantiffs had removed and stored or disposed of the more valuable of the usable parts and was given an opportunity to remove some others.

Frequently the value of requisitioned property cannot be determined with mathematical precision, and the court must determine in the light of the entire record its judgment as to the actual value of the property, based on the testimony and documents in the case.

The commissioner who heard the testimony and listened to the witnesses in person finds that at least 50 percent of plaintiffs' entire yard inventory represented nonsalable materials and that the remainder contained some usable parts which some of the witnesses appraised at $70,590. The commissioner also found that plaintiffs had reasonable prospects of selling 10 percent of these parts at a fair market value of $7,059; and that the remaining material at the scrap value was worth $6,451.52, a total of $13,510.52. The record supports these findings and we adopt them.

The plaintiffs are entitled to recover the sum of $13,510.52, with interest at the rate of 4 percent per annum from August 7, 1942, to October 20, 1943, as a part of just compensation. At that time they were tendered $3,365.53, which tender would stop any payment of interest as just compensation on that amount. Plaintiffs are therefore entitled in addition to recover interest at 4 per cent per annum, as just compensation, on $10,144.99 from October 20, 1943, to date of payment.

It is so ordered.