John MEAD, William J. Mead Franklin J. Mead, III, d/b/a Buttonwood Properties, an Indiana Partnership and Revel Companies, Inc., Appellant,

v.

William SALTER, Appellee.

No. 06A04–8908–CV–375.

Court of Appeals of Indiana, Fourth District.

Feb. 14, 1991.

James A. Goodin, Jon C. Abernathy, Goodin and Kraege, Indianapolis, for appellant.

Denise Page, Sheeks and Ittenbach, James M. Secrest, P.C., Indianapolis, for appellee.

MILLER, Presiding Judge.

This case involves an appeal from a $400,000 jury verdict in favor of plaintiff-appellee William Salter, who was injured when he fell down a stairwell located at the entrance of a downtown Indianapolis office building. He sued the owners and managers of the building, John Mead, William Mead, Franklin J. Mead III d/b/a Buttonwood Properties and Revel Companies, Inc. (collectively referred to as the "Owners").

Owners appeal, raising the following issues:

I. Whether the trial court erred in denying Owners' summary judgment motion

that Salter was a licensee as a matter of law;

II. Whether the trial court erred in refusing to grant Owners' motion for directed verdict that Salter was contributorily negligent as a matter of law;

III. Whether the trial court erred in excluding certain testimony concerning Salter's medical history and condition; and

IV. Whether the trial court erred in admitting photographs of Salter's back surgery.

We affirm.

## FACTS

On November 7, 1983, Salter was on his way to keep an appointment with his attorney, James Secrest, whose office was located in an Indianapolis office building on the Monument Circle. Salter did not recall in which building Secrest's office was located. He entered the Guaranty Building as he started around the Circle, intending to consult the building directory to determine whether Secrest's office was located therein. As he entered the building, he took a step and fell to the bottom of the stairwell located just inside the entrance to the building. He claimed injuries and damages resulting from the fall and filed a complaint in Marion County against the Owners. The suit was venued to Boone County. On May 5, 1989, after a week-long trial, the jury returned a verdict for Salter, and the court entered judgment on the verdict in the amount of $400,000.

The entrance to the Guaranty Building has two large glass doors. The left door opens directly into the lobby where there is an elevator to the offices located on the floors above the entry level. A directory is located near the elevator. The entry door on the right opens to a stairwell leading to a lower level where—at the time of Salter's fall—a restaurant and a health club were located. A glass panel divides the lobby side from the stairway to the lower level.

Salter testified that the lobby floor of the left side of the building could be seen reflected in the glass of the right door, so that when he opened the door on the right

he thought he was entering the lobby of the building. As he opened the door to enter, he fell down the marble stairway located approximately twenty-two inches inside the doorway. There was a sign in black on the glass doors warning visitors to watch their step; however, Salter—who had no sight in one eye due to a childhood accident—claimed he did not see the sign. Pictures showing the reflection were introduced and there was testimony from expert witnesses regarding the visual clues presented by the reflections and lighting.

Salter broke his foot in the fall and did not immediately report back injury, but later developed back problems requiring multiple surgeries. Doctors testified that the resulting back injury, which necessitated surgery, was consistent with a fall such as the one he had sustained.

Other facts will be added as necessary to this opinion.

## DISCUSSION AND DECISION

*Issue I*—Salter's status: Licensee or Invitee

■ Owners contend that the trial court erred in denying their motion for summary judgment on the issue of Salter's status. They argue that summary judgment should have been granted because Salter was a licensee as a matter of law since he entered the building for his own convenience, curiosity or entertainment. *Fleischer v. Hebrew Orthodox Congregation* (1987), Ind. App., 504 N.E.2d 320, *trans. den.* (1989), Ind., 539 N.E.2d 1.

Salter contends that the court did not err and argues that he was an invitee because the office building is held open to the public to enter and do business with its tenants and occupants. A building directory is located in the lobby and used by the public to determine which specific individuals have offices in the building. Therefore, Salter asserts, his entry into the building was clearly within the use contemplated for an office building open to the public. We agree.

Indiana still follows the common law categories of invitee, licensee and trespasser

for determining liability of landowners. *City of Bloomington v. Kuruzovich* (1987), Ind.App., 517 N.E.2d 408. If Salter was an invitee when he entered the Guaranty Building, the Owners owed him a duty of reasonable care under the circumstances and he would only need to prove the Owners were negligent to recover. *Id.* However, if Salter was a licensee, the Owners only owed him a duty to refrain from willfully and wantonly injuring him. *Id.*

Recent cases have extended the invitee category to cover a public invitee. That is, "when one invites the public, or a large segment thereof, onto property for a particular purpose, he is liable to those he invites onto the land for any hazardous conditions he causes or negligently allows to remain on the land." *City of Bloomington, supra,* at 413, citing *Fleischer, supra. City of Bloomington* and *Fleischer* adopt the "public invitee" test as set forth in the Restatement (Second) of Torts § 332 (1965), which provides in relevant part:

(1) An invitee is either a public invitee or a business invitee.

(2) A public invitee is a person who is invited to enter or remain on land as a member of the public for a purpose for which the land is held open to the public.

(3) A business visitor is a person who is invited to enter or remain on land for a purpose directly or indirectly connected with business dealings with the possessor of the land.

The Owners cite *French v. Sunburst Properties, Inc.* (1988), Ind.App., 521 N.E.2d 1355, claiming that Salter does not meet the public invitee test as interpreted by *French.* In *French,* the plaintiff, who tripped over barricades set up in the apartment complex, sought damages from apartment owners. French had been chasing his dog who had strayed into the apartment complex. The court found that the pet owner ran upon the apartment complex property for his own convenience and, therefore, was not a public invitee. The Owners contend Salter merely entered the building intending to check the directory, and thus, like the plaintiff in *French,* entered the building for his own convenience.

Salter argues that the disparity between *French* and the present case is obvious. In *French,* there was no evidence that the apartment owners encouraged or invited pet owners to enter the property. In the present case, the building includes a lobby open for the public to enter and do business with its tenants. James Greenwood, a former Guaranty building manager and engineer, testified that the ten-story office building was open to the public and the only public entrance was the one used by Salter at the front of the building. He further stated that the lobby was a busy one used by the public to check the building directory.

In *Roberts v. Menorah Medical Center* (1989), Mo.App., 777 S.W.2d 330, the Missouri court considered a case similar to the case at bar. Missouri follows the common law categories and also follows the public invitee test as set forth in the Restatement of Torts. In *Roberts,* a woman was injured when she slipped on water on the floor of a hospital hallway. Roberts had gone to the hospital upon receiving a call informing her that her brother had become ill at work and had been taken to the hospital. She drove to the hospital expecting to see her brother, but he had been taken to his doctor's office instead. As she left the hospital to go to the doctor's office, she slipped. The defendants in that case, like the Owners in the present case, argued that Roberts was a licensee because her brother was not at the hospital. The Missouri court disagreed, holding that, under the Restatement definition of a public invitee, visiting those who are in the hospital is a purpose for which the hospital is held open to the public and her status as an invitee was grounded upon her purpose in visiting the hospital. The court concluded that her purpose was consistent with the nature of business conducted there and it was irrelevant that her brother was not actually in the hospital.

We find the Missouri court's reasoning is sound and that it applies to the present situation as well. It is irrelevant that Secrest's office was not in the building as Salter's purpose in entering the building—to check the directory for a potential ten-

ant—was consistent with the purpose for which the building was open.

Salter further points out that a negligence action is rarely appropriately disposed by summary judgment, citing *Stumph v. Foster* (1988), Ind.App., 524 N.E.2d 812. Furthermore, whether an injured party's actions are reasonable in light of his status as it relates to the property owner are issues of material fact precluding summary judgment. *Wright v. International Harvester Co., Inc.* (1988), Ind. App., 528 N.E.2d 837. Here, the question—whether the purpose for which Salter entered the building was of a nature consistent with the purpose for which the building was held open to the public—was properly submitted to the jury. The trial judge instructed the jury on licensee versus invitee status; therefore, we find no error in the trial court's failure to find that Salter was a licensee as a matter of law or its failure to grant summary judgment on this issue.

*Issue II*—Contributory Negligence

■ Owners' argument on this issue assumes that Salter was a pure licensee, rather than an invitee, and that the Owners only owed him a duty to avoid willful or wanton misconduct. They argue any contributory negligence on the part of Salter precludes his recovery and claim the evidence in this case clearly shows he failed to exercise even minimal care for his own safety. They contend the court erred in refusing to grant a directed verdict motion that Salter was contributorily negligent as a matter of law. They cite for support *Hundt v. LaCrosse Grain Company, Inc.* (1983), Ind., 446 N.E.2d 327.

In *Hundt*, an exterminator entered a building with which he was familiar, mistakenly opened a basement door and fell down a stairway. In reversing the jury's verdict in favor of the plaintiff, our supreme court acknowledged the question of contributory negligence should usually be settled by the fact finder; however, "where the facts are undisputed and only a single inference can reasonably be drawn therefrom, the question of contributory negligence becomes one of law." *Hundt*, 446 N.E.2d at 328–29.

In reaching its conclusion, the *Hundt* court relied heavily on *Standard Oil Company v. Henninger* (1935), 100 Ind.App. 674, 196 N.E. 706. The *Hundt* court summarized the *Standard Oil* decision as follows:

"... [T]he plaintiff, Henninger, had stopped at an unfamiliar gas station to see a map. After the attendant showed him a map and gave him directions, Henninger received permission to use the washroom. He then proceeded to open an unmarked door and his own momentum caused him to fall down a flight of stairs to his injury. The court overturned a verdict for Henninger, and found that, 'The conduct of the Appellee, as disclosed by the uncontradicted evidence established contributory negligence' as a matter of law. *Id.* 100 Ind.App. [at] 682, 196 N.E. [at] 709. The court said that a closed door to a stairway does not constitute a trap or pitfall. The fact that a door is there is a warning that it is the means of exit or of entrance to some other area, room or stairway. It defies common sense to assume that persons will precipitately open a door and, without the use of their ordinary senses, enter without a thought as to where it leads."

*Hundt*, 446 N.E.2d at 329.

The facts of the present case are distinguishable from *Hundt* and *Standard Oil*. In *Hundt*, the plaintiff was "thoroughly familiar with the office building and its facilities" having done pest control work there for over twenty years. Hundt entered the unmarked door without regard to any hidden dangers. Thus, the only conclusion that could be drawn was that Hundt was contributorily negligent. Likewise, in *Standard Oil*, the plaintiff walked through a *solid, closed interior door* at a gas station without regard to any hidden dangers. Here, Salter, who was unfamiliar with the building, entered a *glass exterior entrance* to an office building—an entrance which gave the appearance of leading directly into the floor level lobby. There was testi-

mony from Merrill Allen, O.D., Ph.D., a visual perception expert, that the entrance to the building is a trap because the reflections of marble in the glass doorway give the appearance and illusion of a floor extending straight ahead and the warning sign was ineffective. Salter testified that he observed people coming out of the elevator in the lobby, exiting through the left door entrance, and that—thinking he was going into the lobby—he chose the door on the right to avoid running into the people exiting the building through the left door. He also testified he did not see the warning sign on the glass doors. Gene Hayden, a Building Safety Expert, testified that the landing inside the building is too short (22½"–23") and not sufficient for a person to take two steps and that the warning sign may not be seen when there is glare on the glass.

Thus, the conflicting evidence in this case on the issue of contributory negligence was properly left to the determination of the jury. We find no error.

*Issue III—Exclusion of Medical Evidence*

Salter testified that he was in generally good physical condition prior to the accident and the fall represented the "worst lick" he had ever suffered. Owners contend that the trial court erred in refusing to permit evidence of Salter's medical background, including alcoholism, offered by the Owners to give a complete picture of his poor medical health. They argue that, as a result of the trial court's ruling, the jury was left with the impression that Salter was in good health prior to the fall and his health deteriorated only as a consequence thereof. They claim that this evidence was relevant to the question of damages and, thus, the trial court's refusal to admit the evidence prejudiced their defense.

■ The Owners assert that, when a plaintiff places his medical condition into issue by filing a complaint, he opens the door to his prior medical history citing *Collins v. Bair* (1971), 256 Ind. 230, 268 N.E.2d 95. While the Owners concede that patient/physician privilege—which was the issue in *Collins*—is not at issue here, they

argue the reasoning is applicable and the jury was entitled to hear all the evidence regarding Salter's medical history. However, *Collins* does not support the proposition that when one places his physical or mental condition in issue, he opens up his entire medical record for exposure to the world in a trial. *Canfield v. Sandock* (1990), Ind., 563 N.E.2d 526. Information unrelated to the condition in issue and irrelevant to the cause remains privileged and, therefore, protected from discovery. *Id.* Embarrassing or intimate medical information—such as a history of alcoholism—without a causal or historical connection to the condition in issue would not be admissible at trial. *Id.*

■ First, the Owners claim the court erred in refusing to admit Exhibit T into evidence. Exhibit T consisted of certified records from a Veteran's Administration hospital in Houston, Texas for the years 1968, 1971, 1973 and 1974. The 1971 records revealed Salter was admitted to the hospital in a comatose condition and treated for acute alcohol intoxication and chronic alcoholism. The 1973 admission was for a gastric ulcer and the 1974 admission was for alcoholism. The summaries contained in these medical records relate primarily to alcoholism and detailed a drinking history as well as use of tranquilizers.

Before the trial began, Salter had requested and obtained a motion in limine preventing the introduction of any evidence of his history of alcoholism or drug abuse on the basis that there was no evidence or any inference that alcohol or drugs were implicated in the fall at the Guaranty Building in 1983; therefore, the evidence of alcoholism had no relevancy to the issues before the court. Salter also claimed that, even if there was some minimal relevancy, it was properly excluded because its prejudicial value outweighed its probative value. *Peaches v. City of Evansville* (1979), Ind. App., 389 N.E.2d 322 *cert. denied* (1980), 444 U.S. 1033, 100 S.Ct. 704, 62 L.Ed.2d 669. In a hearing conducted outside the presence of the jury, Salter testified that he stopped drinking in 1974 and has used no alcohol or drugs since then.

The admission of evidence is within the sound discretion of the trial court and will only be reversed for an abuse of discretion. A trial court ruling excluding evidence will generally be upheld if there is any basis upon which the ruling is correct. *Rohm v. State* (1990), Ind., 558 N.E.2d 1100, citing with approval *Santini v. Consolidated Rail Corp.* (1987), Ind.App., 505 N.E.2d 832.

We agree with Salter that the prejudicial value of years of alcoholism, resulting in a comatose state, outweighs the value in rebutting Salter's statement that the fall in 1983 was one of the "worst licks" he had suffered. In reaching this conclusion, we observe that alcoholism cannot be equated with injuries received due to accidents. We also observe that the trial judge did permit the Owners to question Salter concerning items appearing in the records unrelated to alcoholism which would impeach Salter's testimony. Particularly, we observe that during their cross-examination of Salter, Owners showed him Exhibit T for the purpose of refreshing his memory. Earlier in the trial, Salter had testified that he had no history of back problems before the fall in 1983. The records in Exhibit T include a hospital admission report for September 29, 1968, indicating that Salter experienced a "traumatic fall" causing a contusion of his neck, elbow and periodic pains. (R.751). Thus, even though Exhibit T itself was not admitted into evidence, the Owners were permitted to cross-examine Salter as to relevant contents of the records for impeachment purposes.

Furthermore, we do not agree with the Owners' characterization of the evidence as leaving the jury with the impression that Salter was in good health prior to the accident and only deteriorated as a result thereof. The testimony of Dr. Sadove and Dr. Colyer—Salter's treating physicians—revealed that Salter suffered from chronic hepatitis and years of steroid use, that he had cancer and had been treated with chemotherapy, and that he was obese and not in outstanding physical condition. Dr. Colyer testified that the years of steroid use contributed to the softening of Salter's bones, which aggravated his back injury, and contributed to the difficulties Salter experienced, resulting in his failure to heal properly and necessitating repeated surgeries. This testimony could not have given the jurors the impression that Salter's condition deteriorated only as a result of his back injury.

■ Finally, Owners also claim the trial court erred in excising portions of Dr. Sorber's deposition testimony. Dr. Sorber, an orthopedic surgeon, examined Salter upon the Owners' request. At trial, the court refused to admit the following deposition testimony (pertinent part):

"Q. Would you briefly just summarize your findings for the jury in regard to Mr. Salter?

A. I found a sick old man. Sick in multiple ways. He has extensive liver disease which I think is going to be quite a problem for him and may lead to his early demise—"

(R.1258).

Ind.Trial Rule 32(B) provides that "objection may be made at trial or hearing to receiving in evidence any depositions or part thereof for any reason that would require the exclusion of the evidence if the witness were then present and testifying." Salter objected to the above material on the basis that, as an orthopedic doctor, Sorber's statement that Salter was a sick old man—with the implication that Salter was terminally ill—was beyond his expertise. Whether Salter was a sick old man with extensive liver disease was a question for an internist, not an orthopedic surgeon who only took spinal x-rays and made a routine back exam. Thus, the excising of this portion of Dr. Sorber's testimony was within the trial court's discretion and absent an abuse of that discretion will not be reversible error. *Spesco, Inc. v. General Electric Co.* (7th Cir.1983), 719 F.2d 233; *Weinstock v. Ott* (1983), Ind.App., 444 N.E.2d 1227. On appeal, the burden of showing reversible error is on appellant; all reasonable presumptions are indulged in favor of the rulings and judgment of the trial court. *Collins v. Thakkar* (1990), Ind.App., 552 N.E.2d 507. We find no reversible error in

the exclusion of part of Dr. Sorber's deposition testimony because other doctors did testify that Salter suffered from chronic hepatitis—a liver disease. Dr. Sorber's testimony was merely cumulative of that which was already admitted. We, therefore, find no error in the trial court's exclusion of either Dr. Sorber's testimony or Salter's medical records.

*Issue IV*—Admitting photographs of Salter's back surgery

█ The Owners also contend the trial court erred in admitting certain photographs taken of Salter's back during surgery. They contend the photographs were gruesome and could only cause undue prejudice to the Owners. They argue the trial court's admission of these photographs was an abuse of discretion, requiring reversal.

Salter argues that even though the photographs—taken during his lengthy hospitalization for his many surgeries—were gruesome, they were used by his treating physicians to illustrate complications arising from Salter's injuries. Dr. Colyer, orthopedic surgeon, and Dr. Sadove, plastic surgeon, testified and used the photographs to illustrate their respective—and different—responsibilities toward Salter's treatment. Dr. Sadove's testimony was by video deposition and shown a day or two after Dr. Colyer's live testimony. The photographs were shown as slides during Dr. Sadove's deposition and not separately exhibited or passed to the jury. Salter contends there was no abuse of discretion warranting reversal. We agree.

The trial court has considerable discretion in the decision to admit photographic evidence, and reversal will occur only on showing of abuse of discretion. *Swanigan v. State* (1986), Ind., 499 N.E.2d 732. Photographs are admissible, if relevant, even though they may be repulsive or gruesome. *Boyd v. State* (1986), Ind., 494 N.E.2d 284, *cert. denied* (1987), 479 U.S. 1046, 107 S.Ct. 910, 93 L.Ed.2d 860. If the photograph serves as an aid to orient the jury and help them understand the evidence, it is relevant. *Swanigan, supra.* Relevance is further determined by whether a witness would be permitted to describe what the photograph depicts. *Boyd, supra,* at 295. Exhibits corroborating a physician's testimony regarding the nature and extent of a plaintiff's injuries are relevant and material, and will not be excluded, although gruesome. *Dudley Sports Co., Inc. v. Schmitt* (1972), 151 Ind.App. 217, 279 N.E.2d 266.

A hearing on the admissibility of these exhibits was held outside the presence of the jury before Dr. Colyer's testimony. After viewing the photographs and questioning Dr. Colyer as to their relevance, the trial judge rejected one photograph (Exhibit 16) as duplicative, but admitted two other photographs (Exhibits 13 and 15) which were offered to illustrate Dr. Colyer's testimony. These photographs portrayed the open wound in Salter's back, the contrast between dead and healthy tissue and bone in the posterior spine removed by Dr. Colyer.

The five photographs used by Dr. Sadove during his deposition, although similar to Dr. Colyer's, were taken by Sadove and retained as part of his medical file. They illustrated the wound which Dr. Sadove closed after Dr. Colyer's surgical procedures were completed, the results of first and second skin graft surgeries, and the final surgical outcome.

The trial judge carefully examined the photographs and considered their gruesome nature. He determined that these photographs were helpful to the jury in understanding the testimony presented by each doctor—one an orthopedic surgeon and the other a plastic surgeon—on the issue of Salter's damages resulting from his back injury. We find no abuse of discretion in the trial court's determination and affirm the trial court.

CHEZEM and GARRARD, JJ., concur.